# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3083

_____

Michael Genthe,          *
         *
      Appellant,       *
         *    Appeal from the United States
      v.          *    District Court for the
         *    District of Nebraska.
Quebecor World Lincoln,     *
         *
      Appellee.        *

_____

Submitted: April 13, 2004
Filed: September 7, 2004

_____

Before WOLLMAN, HANSEN, and BYE, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Michael Genthe appeals from the district court's[1] entry of judgment as a matter of law on two claims that Genthe's employer, Quebecor World Lincoln (Quebecor), unlawfully failed to promote him because it regarded him as having an impairment that substantially limited a major life activity, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12117 et seq. We affirm.

---

[1]The Honorable Warren K. Urbom, United States District Judge for the District of Nebraska.

Since the age of one, Genthe has suffered from Marfan's Syndrome, which is a connective tissue disorder that can manifest itself in various ways. In Genthe's case, he has been left with some curvature of the spine, subluxation of the lenses of the eyes, damage to his aorta, long extremities, and a sunken chest. Notwithstanding the effects of the syndrome, Genthe had worked, with some accommodation regarding limitations on lifting and on overtime hours, for the seven years prior to the initiation of this lawsuit as a Journeyman II Apprentice (J-2) in Quebecor's bindery factory.[2] J-2s were commonly called upon to assist with the operation of the various machines in the bindery factory; to lift and move heavy bundles alone or with other employees; to see accurately and to possess good near, distance, and color vision; and to frequently work overtime.

Genthe applied for promotions to the Journeyman I Apprentice (J-1) position and to the Forklift Operator position, stating that he wanted these promotions because they were less physically demanding and required less overtime. After Quebecor denied his requests for promotion, Genthe brought suit, alleging nine claims of discrimination under the ADA. The jury found in favor of Quebecor on all but two of the claims. On claim four, the jury found that Quebecor had regarded Genthe's impairments as substantially limiting him in one or more of his major life activities; that Quebecor's perception of these impairments was a motivating factor in its decision not to transfer Genthe to the Forklift Operator position; but that nonetheless Quebecor would not have transferred him because he was not the most qualified applicant for that position. On claim five, the jury found that Quebecor had refused to transfer Genthe to the Journeyman I Apprentice position because of its similar

[2]Prior to Quebecor's purchase of the factory from American Signature, the J-2 position was divided into three different roles: J-2, "heavy" and "light." As the name implies, a "heavy" was required to do most of the heavy lifting in the factory. Genthe was successfully employed as a "heavy" until the positions were merged into the J-2 role.

perceptions and motivation and awarded Genthe damages in the amount of $3,302.72. The district court then granted Quebecor's motion for judgment as a matter of law.

We review de novo the district court's grant of judgment as a matter of law. Arabian Agriculture Services Co. v. Chief Industries, Inc., 309 F.3d 479, 482 (8th Cir. 2002). Judgment as a matter of law is appropriate where the evidence adduced at trial is entirely insufficient to support the verdict. Id. In making this determination, we consider all of the evidence in the record without weighing credibility, and we resolve conflicts and make all reasonable inferences in favor of the non-moving party. Id. An inference is reasonable, however, when it "may be drawn from the evidence without resort to speculation." Id. (quoting Fought v. Hayes Wheels International, Inc., 101 F.3d 1275, 1277 (8th Cir. 1996)) (internal quotation marks omitted). Credence should also be given to evidence favoring the moving party where that evidence is uncontradicted and unimpeached and comes from disinterested witnesses. Kinserlow v. CMI Corp., 217 F.3d 1021, 1025-26 (8th Cir. 2000) (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000)).

The ADA prohibits discrimination against "a qualified individual with a disability because of the disability ... in regard to hiring, advancement or discharge." 42 U.S.C. 12112(a); Shipley v. City of University City, 195 F.3d 1020 (8th Cir. 1999). A "qualified individual" is a person who, "with or without reasonable accommodation can perform the essential functions" of the position he or she seeks. 42 U.S.C. § 12111(8). A disability is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual . . . ." 42 U.S.C. § 12102(2). Moreover, an individual is considered disabled under the ADA if he or she has a record of such an impairment or is "regarded as having" such an impairment. Id. "[M]ajor life activity means 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" Krauel v. Iowa Methodist Medical Center, 95 F.3d 674, 677 (8th Cir.

1996) (quoting the non-exclusive enumeration of major life activities from 29 C.F.R. § 1630.2(i)).

To survive Quebecor's post-trial motion, Genthe must have introduced evidence from which the jury could determine 1) that he was regarded as having an impairment that limited a major life activity, 2) that he was a qualified individual, and 3) that he was not promoted because he was regarded as having an impairment that limited a major life activity. Longen v. Waterous Co., 347 F.3d 685, 688 (8th Cir. 2003). The district court held that there was insufficient evidence to support the jury's finding that he was regarded as having such an impairment or that he was passed over for promotion because of that perception.

Genthe argues that the district court improperly required him to introduce direct evidence supporting those two propositions, which, he maintains, is not necessary in the wake of the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (holding that in order to receive a mixed motive instruction under Title VII, "a plaintiff need only produce sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [his or her protected status] was a motivating factor for any employment practice"). We need not reach this question, however, because we conclude that there was no evidence, direct or circumstantial, indicating that Genthe was regarded as having a limiting impairment or that he was passed over for promotion because of such an impairment. Cf. Trammel v. Simmons First Bank of Searcy, 345 F.3d 611, 615 (8th Cir. 2003) (holding that claim could not proceed because of the lack of direct or circumstantial evidence without deciding effect of Desert Palace).

With respect to Genthe's request for promotion to Forklift Operator, the evidence indicated that Dennis Hruza had sole discretion to decide whether to promote Kathy Sieck, a co-worker, or Genthe to the position. He interviewed both Sieck and Genthe and testified that he selected Sieck because she had experience in

material handling and Genthe did not. There is evidence that Hruza was told of some of Genthe's health problems on two occasions. First, Hruza testified that during his interview with Genthe, Genthe mentioned that he had a heart condition and believed that working as a Forklift Operator would be less physically strenuous than his position as a J-2. When asked whether Genthe's heart condition was a factor in his decision-making process, Hruza said no. Second, one of Genthe's evaluations, prepared by Connie Melichar, a co-worker referred to her impression that Genthe was legally blind. There is no evidence that Hruza saw or considered this comment in his decision-making process. In fact, he stated that he ignored the evaluation. In the light most favorable to Genthe, then, the evidence shows that Hruza regarded him as having some health conditions that impaired him and that Hruza decided not to promote him. Genthe argues that this coincidence is sufficient circumstantial evidence of both a perception that his impairment was substantially limiting of a major life activity and of a causal connection between that perception and the adverse employment action. We disagree, for no reasonable juror could infer from this evidence, without resorting to speculation, that the denial of Genthe's request for promotion was in any way caused by a perception that he had an impairment which limited a major life activity. Our cases require both evidence of protected status and of a causal relationship between that status and the adverse employment decision. Accordingly, we conclude that the district court did not err in entering judgment as a matter of law.

As for Genthe's request to be promoted to the Journeyman position, the analysis is the same, although there were more people involved in the decision-making process regarding that position. Rather than a single person exercising sole authority to promote, a committee (composed of half labor representatives and half company officials) made the determination to pass Genthe over for promotion. Again, the decision makers knew of certain aspects of Genthe's physical condition, including that he had a heart problem, that he at times had lifting and overtime accommodations, and that his vision had been questioned by Ms. Melichar. In the

light most favorable to Genthe, then, the committee members regarded him as having some impairments at the time they decided not to promote him. This was the sum total of the evidence upon which the jury could base its verdict. We conclude that this evidence is insufficient to support, without resort to speculation, the inferences that Genthe was regarded as having an impairment which limited a major life activity or that he was passed over for promotion because of that perception.

Finally, Genthe argues that the district court committed plain error in its jury charge regarding Genthe's allegation that he was discriminated against because he had a record of an impairment that substantially limited a major life activity. "Plain error review is narrow and confined to the exceptional case where error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings. The verdict should be reversed only if the error prejudices the substantial rights of a party and would result in a miscarriage of justice if left uncorrected." BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 (8th Cir. 2003) (quoting Chem-Trend, Inc. v. Newport Industries, Inc., 279 F.3d 625, 629 (8th Cir. 2002)). Without deciding whether the district court's instructions were erroneous, we conclude that reversal would not be appropriate in any event because Genthe has failed to establish any facts upon which the jury could base a determination that he had a record of an impairment that limited a major life activity or that such a record of impairment caused any adverse employment action. Genthe points only to his non-permanent vision problems and his occasional seizures (by his own admission, none occurred between November 1997 and the summer of 2000) as evidence of a record of impairment. He does not cite any facts in the record from which a jury could determine that these impairments limited him in a major life activity, because, but for short periods of convalescence, he had successfully performed the position of J-2 – which required that he be able to work, think, read, and lift, among other things – for the seven years preceding initiation of this law suit. Additionally, he fails to point us to any adverse employment action that was caused by this alleged record of impairment. We note too that, given the jury's rejection of his actual disability claim and our decision with

respect to his perceived disability claim, "it is virtually inconceivable that the jury would have found for [him] on a record of disability theory." Weber v. Strippit, Inc., 186 F.3d 907, 915 (8th Cir. 1999).

The judgment is affirmed.

BYE, Circuit Judge, concurring in part and dissenting in part.

I join the majority's decision affirming the district court's grant of judgment as a matter of law as to the forklift operator position. But, because I believe there was sufficient evidence for the jury to find in favor of Genthe as to the J-1 position, I dissent from that portion of the opinion.

Michael Genthe suffers from Marfan's Syndrome, a genetic disorder affecting the body's connective tissue. The syndrome affects the entire body but is most noticeable in its effects on the musculoskeletal system, eyes and cardiovascular system. Outward manifestations include an elongated skeletal structure, curvature of the spine and sunken chest. The condition frequently leads to myopia, subluxation of the lenses in the eyes, and stretching of blood vessels and arteries. Genthe has suffered from Marfan's since the age of one. At age sixteen he underwent surgery to replace part of his ascending aorta which had stretched to the point an aneurysm was imminent. Genthe also underwent valve replacement surgery to prevent blood from back-flowing into his heart. The surgeries left him prone to strokes so he takes blood-thinning medication and undergoes yearly visits with a cardiologist to monitor the condition. Despite these problems, Genthe is able to work and for purposes of this appeal does not contend he is disabled within the meaning of the ADA.

In 1993, Genthe began working for American Signature, a printing company, in its bindery department. Genthe worked as a "heavy," unloading stacks of magazine parts for insertion into a binder machine and then loading the finished product into

mail bags. The job frequently required him to lift up to seventy pounds and work overtime up to sixty hours. Genthe also worked periodically as a "light," making sure the magazine sections loaded into the binder by heavies were placed in the correct slots. The job of a light requires light lifting and the ability to read and follow directions so the magazines are properly configured. Both heavies and lights are supervised by a Journeyman I or Journeyman I Apprentice who operates the binder and is responsible for meeting production goals. In January 1997, Quebecor purchased American Signature and retained Genthe. Quebecor combined the positions of heavies and lights into a single position nominated Journeyman II but did not significantly change Genthe's job requirements.

In the summer of 1997, Genthe began experiencing significant atrial fibrillation at work. In July 1997, he suffered a suspected stroke and was hospitalized. After being released, Genthe began suffering seizures lasting several minutes and occurring at least three times per week. The seizures affected his ability to work and in November 1997, Genthe was again hospitalized following a seizure. Thereafter, Genthe was prescribed anti-seizure medication and released from work until he was seizure-free for at least six months. In order to qualify for short term disability, Genthe provided Quebecor with his complete medical file documenting his health problems. He also met with Warren Lesco, head of Human Relations, to discuss his medical condition and provide him with information about Marfan's Syndrome.

Genthe returned to Quebecor in April 1998, with a twenty-pound lifting restriction and orders to work no more than forty hours per week. In May 1998, Genthe underwent eye surgery after the lens in his right eye dislocated. Genthe had no further problems with seizures (save for one episode in 2001) but suffered severe episodes of tachycardia. In August 1999, his cardiologist performed an ablation procedure on the AV-node reentry in his heart which reduced the frequency of his tachycardia.

By March 2000, Genthe's health had improved and he requested a letter from his physician allowing him to increase his work hours. The physician responded with a letter indicating Genthe was free to work overtime up to sixty hours per week if he wished. Quebecor, however, complained the letter left the decision about how many hours Genthe would work up to him, and asked for a letter establishing a specific limit on the number of hours he could work. Apparently, no such letter was forthcoming but Quebecor increased Genthe's hours and required him frequently to work sixty hours per week. Genthe concluded he could not regularly work sixty hours and filed a grievance. Eventually, Genthe's treating physician restricted him to a forty-eight-hour work week and imposed a fifty-pound lifting restriction.

It is against this backdrop that in April 2000, Genthe applied for promotion to the J-I position. The position involved more pay and was less physically demanding than Genthe's current position. Steve Fructl, Bindery Department Head, announced four openings for J-Is. Eight such positions were expected to be filled but Fructl chose to begin by advertising only four. The selection process required candidates to be interviewed by a Journeyman Apprentice Committee (JAC) made up of an equal number of union and management representatives. Among others, Fructl, Lesco and union vice president Pete Pietrowski sat on the JAC. After conducting interviews and reviewing information submitted by the candidates, their supervisors, and Human Relations, the JAC would submit its selections to Fructl for final approval.

Genthe interviewed in June 2000, and during the interview several questions were raised about his medical condition. Following the interview, the JAC met to discuss the candidates and several comments and questions relating to Genthe's medical condition arose. One JAC member questioned Genthe's vision and another expressed concern over whether he would be able to handle the stress of the position. Another co-worker indicated Genthe "has a hard time sometimes with his job due to health reasons. Can't work overtime because of health." Still another co-worker stated Genthe was only able to work thirty-six hours. At his deposition, Fructl denied

that Genthe's medical condition was discussed at the JAC meeting. Later, after Pietowski's handwritten notes from the meeting contradicted Fructl's claim, he admitted the discussions occurred. At trial, Fructl testified he did not take Genthe's medical condition into account in making a hiring decision and admonished JAC members not to base a hiring decision on any perceived disability. Pietrowski, however, testified he was the one who told JAC members not to consider Genthe's physical problems. Genthe was not hired for the J-I position but was named first alternate, meaning he would be immediately promoted if a position opened up within the next ninety days.

At about this same time, Fructl hired a fifth J-I from outside the company. Randy Deahn, a former Quebecor J-I employee, was not required to go through the interview process and was hired ahead of Genthe. At trial, Fructl contended Deahn may have been hired before Genthe was named first alternate but Pietrowski testified he did not see Deahn at Quebecor until after the four J-I positions were filled. The union filed a grievance and in November 2000 reached a tentative settlement whereby Quebecor would promote the first alternate to J-I. Union president Richard Conn and vice president Pietrowski testified they believed Quebecor did not realize Genthe was the first alternate. Fructl told Genthe if he could work forty-eight hours and lift fifty pounds he would be promoted.[3] Later, however, in January 2001, Genthe was advised he would not be promoted unless he could produce a note indicating he could work sixty hours. Genthe did not believe he was capable of consistently working sixty hours and requested an accommodation allowing him to work forty-eight hours. Genthe argued a sixty-hour work week was not an essential function of the position and produced evidence showing Quebecor had accommodated other J-Is by allowing them to work only fifty hours. In the end, Genthe was not promoted.

---

[3]Fructl denied the conversation but the jury was free to disregard Fructl's testimony and accept Genthe's version of the events.

-10-

The majority concludes this evidence is insufficient to support the jury's conclusion that Quebecor regarded Genthe as disabled. I respectfully disagree.

Quebecor was aware Genthe suffered from Marfan's and that beginning in 1997 he experienced serious health problems, including a stroke, seizures, and heart problems. These health problems culminated in a six-month absence from work during which time Genthe collected disability insurance. When Genthe returned to work, he was limited in the number of hours he could work and the amount he could lift. Quebecor was also aware Genthe suffered from vision problems. Genthe had two surgeries to replace the lenses in his eyes and at least two co-employees questioned whether he was fit for promotion due to vision problems. Additionally, during the J-I selection process several comments were made about Genthe's health problems, including problems with his vision, heart and ability to work overtime.

There is also evidence suggesting Quebecor's proffered reasons for refusing to promote Genthe to the J-I position were pretextual. After naming Genthe as first alternate, Quebecor ignored its own established procedures and hired a fifth J-I from outside the company. Quebecor officials suggested the hiring decision was made before Genthe was named as an alternate, but other evidence contradicts the claim. For JAML purposes, contested evidence contrary to the verdict must be disregarded. Later, after Quebecor agreed to promote the first alternate, Genthe was told he would only be promoted if he could work up to sixty hours per week. Previously, however, despite being unable to regularly work sixty hours per week, Quebecor found Genthe qualified for the position and named him first alternate. The fact that Quebecor obviously found him qualified but later imposed additional job requirements renders the decision suspect.

In order to find in favor of Genthe it was not enough for the jury to conclude Quebecor regarded him as disabled. Rather, Genthe had to prove Quebecor regarded him as disabled within the meaning of the ADA, i.e., substantially limited in a major

life activity. According to the regulations that guide the interpretation of the ADA, an impairment is "substantially limiting" if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform such an activity compared to the general population. 29 C.F.R. § 1630.2(j)(1)(i)-(ii). Major life activities include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working, 29 C.F.R. § 1630.2(i), as well as sitting, standing, lifting, and reaching. Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 948 (8th Cir. 1999). Several factors are considered in determining whether a person is substantially limited in a major life activity: 1) the nature and severity of the impairment; 2) its duration or anticipated duration; and 3) its long-term impact. 29 C.F.R. § 1630.2(j)(2)(i)-(iii). Much of the evidence presented in this case was conflicting and circumstantial, and Genthe could have done a better job explaining what major life activity he claims Quebecor believed he could not fully perform. Nevertheless, after considering the evidence, the jury concluded Quebecor failed to promote Genthe because it regarded him as disabled within the meaning of the ADA. While the jury could have easily reached a different conclusion, I disagree with the district court's holding that there was insufficient evidence to support the verdict. Accordingly, I would reverse the district court's grant of JAML on this claim, reinstate the jury's verdict, and remand for consideration of Genthe's post-trial motions. I join the majority opinion in all other respects.

_____