# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2220/2429

_____

Clyde O. Carter, Jr.; Lawrence Hopkins,   *
   *
             Plaintiffs,   *
   *
Stephen Jeffery,   *
   *
        Appellant/Cross-Appellee,   *
   * Appeal from the United States
     v.   * District Court for the Western
   * District of Missouri.
The Kansas City Southern Railway   *
Company,   *
   *
        Appellee/Cross-Appellant.   *

_____

Submitted: January 12, 2006
Filed: August 4, 2006

_____

Before LOKEN, Chief Judge, McMILLIAN[1] and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

_____

[1] The Honorable Theodore McMillian died on January 18, 2006. This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. Rule 47E.

Stephen Jeffery appeals the judgment of the district court[2] setting aside punitive damages that had been awarded after a trial by jury. Kansas City Southern Railway Company ("Southern"), in a cross-appeal, argues that the district court erred by not precluding Jeffery's claims under the doctrine of res judicata and by submitting Jeffery's claims of race discrimination to the jury. We affirm.

I.

This appeal arises from a racial discrimination complaint filed by Jeffery against Southern under Title VII of the Civil Rights Act. The jury found for Jeffery and awarded $128,000 in actual damages and $900,000 in punitive damages. The district court set aside the punitive damages award, but did not disturb the jury's verdict or award of actual damages. The history of events that gave rise to the original complaint is described below.[3]

Jeffery, who is African-American, was an employee of Southern charged with repairing rail vehicles and otherwise keeping the cars rail-worthy. Jeffery worked in the Car Department in Southern's rail yard. In working for Southern, Jeffery was confronted with racially offensive language. Jeffery and two other African-American employees (Clyde Carter and Lawrence Hopkins) regularly heard other employees use "nigger" and other racial slurs. Carter testified that racial epithets were part of the

---

[2] The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

[3] Although the timing of events is crucial in this appeal, the record is often silent on when certain events occurred. Consequently, the descriptions contained herein do not always point to precise dates or sequence the events in a definitive order. Further, while the record is replete with significant egregious conduct, the plaintiffs have often failed to provide any evidence concerning Southern's knowledge of certain events. While we have attempted to read the record in a light most favorable to the jury's verdict, the record is incomplete in several important respects.

"day-to-day" experience of working for Southern, and he heard the term "nigger" used "at least 10 to 15 times a day."

According to the allegations of Carter, Hopkins, and Jeffery, one of the chief offenders using racially insensitive conduct was Kelly Fletcher, a co-worker of Carter, Hopkins, and Jeffery. In addition to using racial slurs, Fletcher maintained a locker in the Car Department with a racially charged display. In the locker there was an "afro" wig, a dreadlock wig, and a "pimp" costume that was adorned with gold chains. Fletcher would dress up in the wigs and costumes and pretend to be an exaggerated stereotype of an African-American "pimp." Carter testified that once while wearing the costume, Fletcher went around the break room and kept asking "[y]o, yo, yo, am I black enough for you?" The parties disagree on whether the costume and wigs were visible on a regular basis while being kept in the locker. For purposes for this review, we assume the testimony of the plaintiffs was correct that the contents of the locker were often visible. Carter testified that anyone walking by the locker on a regular basis would have seen the costume. Management denied seeing the costume before receiving Carter's complaints.

Jeffery also alleges that African-American employees were regularly denied tools they needed to perform their repair jobs. Jeffery asserts that similarly situated Caucasian workers did not encounter the same difficulties in procuring tools. Jeffery also contends that management was unresponsive to requests of African-American employees to receive tools.

Jeffery alleges that the bulletin boards in the Car Department would often contain racially offensive language. Specifically, the words "nigger" and "tar baby" were on scraps of paper on the bulletin board. Jeffery alleges that cleaning workers regularly removed the notes, but that the notes were replaced by other racially offensive posts. The bulletin board was in the Car Department break room where employees would have daily safety meetings with supervisors.

Jeffery also points to a variety of other racially hostile comments. In one instance, another employee brought in a watermelon and remarked that "all black people like watermelon." On another occasion, a different employee saw an African-American child and said "[o]h, what a cute little nigger baby." Jeffery refers to an account of other incidents where Fletcher made jokes about the color of Hopkins's skin and the genitals of African-American employees.

Jeffery reported several of the incidents to car foremen, but most of his reports were not to management-level employees.[4] However, on February 26, 2002, Jeffery told Rick Mygatt, Jeffery's supervisor and company manager of Southern's Car Department, about some of the racially offensive conduct that was occurring. Jeffery also made this complaint known to Tim Lincoln, Mygatt's supervisor. The focus of Jeffery's complaint to Mygatt and Lincoln was the conduct of Kelly Fletcher. Jeffery had taken pictures of the "pimp" costume in Fletcher's locker to support his complaint. Jeffery did not complain about the content of the bulletin board, a lack of tools, or racially offensive language by employees other than Fletcher. Jeffery testified that the reason he did not make any further complaints to Mygatt was because Carter had told him that Mygatt had threatened Carter's job for making complaints of racial discrimination. However, these threats did not deter Carter from making other complaints.

Jeffery testified that, after he made his complaint to Mygatt, other workers threatened Jeffery's safety on the rail tracks. Specifically, other employees misled Jeffery about whether cars were locked, exposing Jeffery to the risk that a train might roll over him. Jeffery also said other employees stopped answering the radio when

---

[4] While Jeffery contends that these foremen are supervisors, there is nothing in the record to indicate they acted in a management-level capacity for purposes of Title VII. And Jeffery does not point to any case law to support the contention that these foremen, many of whom were fellow union employees, were managers for the purposes of Title VII.

he called. There was also an incident where a blue light was missing such that Jeffery could have been hit by an oncoming train. Jeffery also found his truck parked on the tracks, but he did not know who had put it there. Jeffery never reported any of these safety-related incidents to Southern's management.

Jeffery continued to make oral requests for tools to foremen on the job as well as through a written note to Mygatt. His requests generally went unanswered. In his requests to management, Jeffery never alleged that he was being denied tools because of his race.

Following Jeffery's complaint to Mygatt regarding Fletcher, Southern began an investigation into Fletcher's conduct. The investigation was conducted according to the provisions of the collective bargaining agreement between Southern and the workers' union. After the investigation, Fletcher was terminated. However, the stated reasons for Fletcher's termination were not exclusively because of the allegations made by Jeffery. The general basis for the firing was unprofessional behavior by Fletcher which may have included the racially insensitive conduct by Fletcher. Fletcher testified that he was actually "absolved" of the conduct that formed the basis of Jeffery's complaint. Fletcher's statements that he was exonerated were not supported by any other evidence at trial.

Because of the racial harassment at work, Jeffery began to see Dr. Roger Berlin. Berlin treated Jeffery for job-related stress. In addition to prescribing medication, Berlin eventually recommended that Jeffery not return to his job with Southern. Berlin forwarded his concerns about Jeffery to a representative of Southern. On the basis of those recommendations, Southern gave Jeffery leave from work.

On September 6, 2002, Jeffery, Carter, and Hopkins filed the lawsuit against Southern underlying this appeal.[5] After a trial, the jury found in favor of the plaintiffs and awarded punitive and actual damages to Jeffery. After a motion by Southern, the district court set aside the award of punitive damages. However, the district court denied Southern's motion to set aside the jury's verdict based on the doctrine of res judicata.

The basis for Southern's res judicata argument was that prior to the filing of the Title VII claim by the plaintiffs in this case, Jeffery had filed a separate action against Southern. On October 30, 2001, Jeffery filed an action against Southern related to racial discrimination in connection with a medical claim. This claim concerned conduct that was alleged to have occurred in October 2000. In filing this complaint, Jeffery went through the normal process prescribed by the Equal Employment Opportunity Commission (EEOC) and received a right-to-sue letter from the EEOC. In his complaint to the EEOC regarding the medical claim, Jeffery did not specifically list his general claims about racial discrimination with the company even though some of the alleged conduct in this case predated the EEOC investigation.

Jeffery appeals the decision to set aside the punitive damages, and Southern cross-appeals the denial of the motion to set aside the verdict based upon the doctrine of res judicata and argues that the racial discrimination claims should have never been submitted to the jury. We discuss each argument in turn below.

II.

Jeffery contends that the district court erred in setting aside the jury's punitive damages award. "We review de novo the district court's grant of judgment as a

---

[5] Hopkins and Carter did not appeal the judgment of the district court and are not parties to this appeal.

matter of law." Genthe v. Quebecor World Lincoln, 383 F.3d 713, 716 (8th Cir. 2004). Judgment as a matter of law is only warranted where the evidence at trial is wholly insufficient to support a jury finding. Id.

In Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999), the United States Supreme Court described limitations on employers' vicarious liability for punitive damages in Title VII cases:

> Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatements' strict limits on vicarious liability for punitive damages, we agree that, in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII.

Id. at 545 (internal quotation omitted). Some of the factors to be considered in an award of punitive damages are the outrageousness of the defendant's conduct, the defendant's financial status, the injury suffered, the relationship between the parties, and the aggravating and mitigating factors. Conseco Fin. Servicing Corp. v. N. Am. Mtg. Co., 381 F.3d 811, 823 (8th Cir. 2004). Punitive damages are only awarded when the defendant operated with reckless indifference or malice in regard to the conduct alleged by the plaintiff. Kolstad, 527 U.S. at 545. Further, punitive damages should only be awarded to a plaintiff who directly suffered the specific conduct that underlies the claim for punitive damages. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 422-23 (2003).

In this case, Southern conducted an investigation, terminated the employee who had been responsible for the bulk of the wrongful conduct, and had a Title VII compliance policy in place. Further, the only plaintiff appealing the judgment of the district court is Jeffery. However, Jeffery is not the plaintiff who allegedly suffered

much of the wrongful conduct that might justify punitive damages. Therefore, the focus of our review in determining whether punitive damages are warranted is to examine the alleged conduct experienced by Jeffery after the wrongful conduct became known to Southern. Unfortunately, in this case, the record contains many ambiguities about the timing and details of legally significant events. Consequently, we address each of the areas of wrongful conduct in turn to determine if malice or reckless indifference by Southern was evidenced at trial.

The first area of alleged wrongful conduct is the use of offensive language. In regard to the racial slurs at the rail yard, Jeffery contends such conduct was endemic. However, he is only able to point to a few isolated instances that occurred after he complained to Southern. Of those instances, Jeffery did not testify that he reported any of them to Southern. From the standpoint of Southern, it received the complaints from the plaintiffs, investigated, and fired Fletcher. Because Southern acted appropriately in responding to Jeffery's complaint, it is illogical to ascribe malice or reckless indifference to Southern for failing to act in compliance with Title VII on this issue.

A second area of wrongful conduct pertains to the continued existence of racially offensive language on the break room bulletin board. The argument to award punitive damages based on such conduct fails on three grounds. First, Jeffery did not testify that he saw the bulletin board postings. Rather, Jeffery relies on the claims of the other plaintiffs in this case. As noted above, a plaintiff must show he or she personally suffered from alleged wrongful conduct to be awarded punitive damages. See Williams v. ConAgra Poultry Co., 378 F.3d 790, 797 (8th Cir. 2004) (noting that "it is crucial that a court focus on the conduct related to the plaintiff's claim rather than the conduct of the defendant in general"). Second, Jeffery was unable at oral argument or in the briefing to point to any evidence that the bulletin board contained racially offensive language after Southern received complaints. Third, the record is unclear as to whether actual complaints were made by Jeffery about the content of the

bulletin board. Consequently, we do not find sufficiently egregious conduct by Southern to warrant punitive damages for the bulletin board materials.

A third type of wrongful conduct Jeffery identifies concerns Fletcher's locker. However, the evidence in the record shows that the display in Fletcher's locker was removed in a timely fashion after the complaints by the plaintiffs. Southern performed an investigation and then took steps to remove the offensive display and terminated Fletcher's employment. Those actions were taken in order to comply with Title VII and should not be discouraged by the application of punitive damages.

A fourth area of wrongful conduct in this case focuses on the unequal access of employees to tools. Jeffery contends that African-American employees were denied the same tools needed for their jobs that Caucasian workers received. This is the only area of wrongful conduct cited by the plaintiffs that is directly attributed to Southern's management. Jeffery alleges that Mygatt was responsible for the unequal distribution of tools. The chief problem with this argument is that none of the plaintiffs were able to testify that Caucasian workers received tools because of their race. The evidence to support this contention was ruled inadmissible hearsay by the district judge and was not before the jury. Consequently, there is no basis in the record for the jury to believe that alleged unequal tools distribution was based upon race. Further, taken alone, the access to tools is insufficient to justify the jury's punitive damages award. In such circumstances, there is no evidence to support the findings underlying the punitive damages award based upon access to tools.

The rest of the alleged conduct Jeffery identifies fails to support a punitive damages finding for reasons similar to those set forth above. Jeffery simply did not show that he experienced discrimination after his complaints that could justify the jury's finding of punitive damages. Further, he did not complain about the various encounters with other workers after his sole complaint. Finally, Jeffery did not testify

that any of the post-complaint threats to his safety were caused by or reported to anyone in management of Southern.

Accordingly, we affirm the judgment of the district court and find that the jury abused its discretion by awarding punitive damages in this matter.

III.

On the cross-appeal, Southern argues that Jeffery's claims should be barred by the doctrine of res judicata. We review de novo the decision to apply the doctrine of res judicata. Lundquist v. Rice Mem'l Hosp., 238 F.3d 975, 976 (8th Cir. 2001). "Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979). The district court held that Jeffery's claims were not barred by his previous complaint against Southern. We agree.

The first lawsuit concerned a much narrower issue than the one underlying this appeal. Specifically, it was about Jeffery's belief that Southern was discriminating on the basis of race in requiring Jeffery to produce a medical excuse for two work absences in October 2000. The facts alleged in that case are not at issue in this matter. Further, at the time of the filing of that complaint, most of the instances of racial discrimination that underlie this appeal had not yet occurred. While Jeffery did testify that he had experienced some discrimination dating back to 1995, the conduct in this case is sufficiently dissimilar such that the doctrine of res judicata does not apply.

-10-

IV.

Southern further contends on cross-appeal that the district court erred in submitting the racial discrimination claim to the jury.[6]  Southern argues that it responded promptly and fulfilled its obligations under Title VII.  The question of whether there was sufficient evidence to submit an issue to a jury is a legal one that we review de novo.  Cross v. Cleaver, 142 F.3d 1059, 1066 (8th Cir. 1998).  In order for a claim to survive a judgment as a matter of law, a plaintiff must show "the evidence is sufficient to support whatever finding was made at trial."  EEOC v. Kohler Co., 335 F.3d 766, 774 n.7 (8th Cir. 2003) (internal quotations omitted).

To establish intentional discrimination where the wrongful conduct is by a co-worker, a plaintiff must be able to show that "'the employer knew or should have known of the harassment and failed to take proper remedial action.'"  Alagna v. Smithville R-II Sch. Dist., 324 F.3d 975, 979 (8th Cir. 2003) (quoting Scusa v. Nestle U.S.A. Co., 181 F.3d 958, 965 (8th Cir. 1999).  Southern contends that the employer took the proper remedial action in terminating Fletcher's employment and reacted promptly to the other reports of harassment.

---

[6] We question whether this issue is properly before us.  Southern filed a Federal Rule of Civil Procedure 50(a) motion during trial raising the issue of the sufficiency of the evidence to support submitting the racial discrimination claim to the jury.  However, in its post-trial Rule 50(b) motion, it only argued res judicata/issue preclusion and judgment as a matter of law on punitive damages.  It did incorporate by reference its prior motion for summary judgment, but did not reference the prior Rule 50(a) motion made at the close of plaintiff's case.  We question whether that is adequate to preserve any error on the sufficiency issue.  Pulla v. Amoco Oil Company, 72 F.3d 648, 655-656 (8th Cir. 1995); Kline v. City of Kansas City, 175 F.3d 660, 670 (8th Cir. 1999).  However, since neither party has raised the issue we proceed to decide the sufficiency issue.

In this case, there was legally sufficient evidence for the district court to have submitted the racial discrimination claim to the jury and for the jury to reach its verdict.. Specifically, there is testimony in the record that demonstrates Southern's culpability in the harassment. While Southern took prompt action in removing Fletcher, a jury could determine that its response to the rest of the alleged harassment was lacking. Carter testified that he was threatened by Mygatt and Lincoln and told not to make any further complaints about racial harassment. These threats do not justify punitive damages because they were not directly experienced by Jeffery. However, actions by management that show a hostility to complaints of racial harassment even when the plaintiff was not aware of those actions can create an inference sufficient to establish intentional discrimination. See Williams, 378 F.3d at 794.

Further, there was testimony from several witnesses that the use of racially offensive language was so commonplace that a jury could find that members of management should have been aware of it and taken prompt remedial action. There was evidence that Fletcher's locker was often visible to everyone in the locker room which included managers. The daily safety meeting was held in a break room with a bulletin board that often had racial slurs written upon it. In an environment with substantial racially hostile conduct, the employer cannot escape liability by merely pointing to its legally required investigation and anti-discrimination policies. Madison v. IBP, Inc., 257 F.3d 780, 795-96 (8th Cir. 2001), *overruled on other grounds by* Jones v. R.R. Donnelley & Sons, 541 U.S. 369 (2004). Therefore, there was more than sufficient evidence for the district court to submit the racial discrimination claim to the jury. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 519 (1993).

However, as noted in Section II, the evidence of racial discrimination does not demonstrate the requisite culpability to justify punitive damages. Chiefly, the harassment did not continue in a systemic sense after complaints were made. Further,

while managers may have been aware of some offensive conduct, Jeffery has failed to show anything in the record to indicate actual malice or reckless indifference by Southern.

## V.

For the foregoing reasons, we affirm the judgment of the district court.

_____