# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3236

_____

William J. Dominic,                    *
                                       *
        Plaintiff - Appellee,          *
                                       *   Appeal from the United States
    v.                                 *   District Court for the Western
                                       *   District of Arkansas.
                                       *
DeVilbiss Air Power Company,           *
                                       *
        Defendant - Appellant.         *

_____

Submitted: April 10, 2007
Filed: July 20, 2007

_____

Before MURPHY, BRIGHT, and BENTON, Circuit Judges.

_____

MURPHY, Circuit Judge.

William J. Dominic sued his employer DeVilbiss Air Power Company (company) for sexual harassment and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq., and the Arkansas Civil Rights Act, Ark. Code. Ann. §§ 16-123-101 et seq. A jury found in favor of Dominic on several claims and awarded compensatory and punitive damages, and the district court denied the company's motion for judgment as a matter of law or new trial. The company appeals, focusing only on the award of punitive damages. We reverse.

William J. Dominic was hired by DeVilbiss Air Power Company as a cost accountant in the company's Decatur, Arkansas manufacturing facility in January 2003. The Decatur plant employs 200 permanent full time workers and 110 temporary employees. Dominic was promoted to accounting manager by early 2004. Throughout his employment at the company, he was directly supervised by Patricia J. Fant, controller for the Decatur facility. As accounting manager, Dominic was Fant's second in command of the accounting department. On Friday, April 30, 2004, plant manager Chuck Chism overheard Dominic telling another employee that Fant had made sexual advances toward him. Dominic then stopped Chism and told him about the incidents. Chism asked Dominic to submit a written description of Fant's behavior. Dominic submitted a first draft that day and a more detailed report the next Monday, May 3.

In his written description Dominic claimed that around March 11, 2004, he and Fant met after work for drinks at a country club. While they were at the club Fant tried to unzip Dominic's pants and grab his crotch area. About one week later Dominic, Fant, and other members of the accounting department met for drinks. At that outing, Fant offered the group the use of her parents' van and her brother's pornographic movies for a team building trip. Dominic reported that after the rest of the group left, she asked if he wanted to rent a hotel room so she could tie him up and attack him. He also stated that Fant brought him coffee, did unrequested favors for him, stopped by his office, called him up even though she had no business to discuss, and acted jealous when he spoke to other women.

After Chism reviewed Dominic's claims, he set up a meeting to discuss the charges. At the meeting Larry Hoover, the company's human resources manager, and Chism agreed to investigate the charges and Dominic gave them a list of people who could substantiate his claims. The next day Hoover and Chism met with Fant to discuss Dominic's allegations. She denied all his claims. She was nevertheless sent home on paid leave, instructed not to contact anyone at the office, and was to remain home while the company investigated the charges.

As part of the company's investigation, Chism and Hoover questioned each person on Dominic's list of employees who could substantiate his claims as well as all other workers in the departments headed by Fant and Dominic. Chism and Hoover were particularly concerned about what they considered the most serious allegations, that Fant had unzipped Dominic's pants and suggested that they get a hotel room. A list of questions was prepared by Chism and Hoover to be asked of each interviewee. These questions included: How is your job going? How would you describe the work climate in your department? How is your relationship with Patricia Fant? Does the department socialize outside work? Did you attend an event at a bar with the group around March 19? Tell us about that experience. Has the group been planning a team building trip? Have you ever observed any conduct that you thought was inappropriate in the department? The employees who were interviewed did not confirm Dominic's allegations, except for his claims that Fant stopped by his desk, brought him coffee, and sometimes acted jealous when he interacted with other women. On May 6 Chism and Hoover again met with Dominic at the plant and with Fant offsite to ask some follow up questions.

Later in the day on May 6, Chism and Hoover also contacted Claude Kelly, a vice president of Pentair which was the corporate owner of the company. Kelly oversaw the human resources area for Pentair. After he heard about the results of the investigation by Chism and Hoover, he traveled to Decatur from his office in Jackson, Tennessee to discuss the matter with Chism, Hoover, and Dominic. Chism, Hoover, and Kelly also consulted Pentair's attorney several times to ensure that their investigation met all legal requirements. Management agreed that there were not grounds to terminate Fant even though she had acted inappropriately by engaging in "bar talk" with employees she supervised.

Kelly and Hoover met again with Dominic on May 10. They told him that their investigation had not substantiated the most serious allegations and that Fant would be returning to work. Although Fant would remain in her position as Dominic's supervisor, they explained that the accounting department would be required to meet

daily as a group to minimize one on one communication between Fant and Dominic. They encouraged Dominic to report any incidents of retaliation and gave him the rest of the day off with pay. Kelly then met with the employees who reported to Fant and Dominic and asked them to make it as easy as possible for the two to work together.

Kelly and Hoover also met with Fant on May 10; she again denied the allegations. Kelly told Fant she would be allowed to return to work, but that she had acted unprofessionally and should refrain from socializing with employees in bars after work. They warned her that she would be terminated if she retaliated against Dominic. They also gave Fant a letter explaining the conditions of her return and listing specific examples of what could be considered retaliation. These examples included dramatic changes to Dominic's work assignments, threats of termination, and inappropriate discipline of him. Fant signed the letter and Chism followed up with three members of the department on May 27 to gauge the effectiveness of the daily meetings and to ask them if they had noticed any behavior by Fant toward Dominic that could have been retaliatory. None of the employees reported any inappropriate behavior. Dominic did not complain of any further sexual harassment after the company's investigation.

Soon after Dominic and Fant began working together again, Dominic sent management a series of emails alleging retaliation by Fant. He claimed Fant criticized his work publicly, gave him too much work, assigned him busywork, tried to sabotage his work, and gave him false instructions. He also alleged that Fant had given him an order that would have caused him to violate the Sarbanes-Oxley Act; he did not give any details about her request or explain why it would be illegal, however. Dominic complained that someone had deleted work after he completed it, and he began asking for technical support to backup his work. Chism and Hoover met with Dominic on May 14, the same day they received his first email alleging retaliation. They asked him for more details because of the conclusory nature of some of his claims. Dominic refused to provide further details, claiming attorney client privilege. After this meeting, management spoke to Fant about Dominic's complaints.

She denied all allegations and submitted a written memorandum on May 15 responding to each of Dominic's allegations.

On May 20 Dominic sent another email alleging that Fant had been rude and obnoxious toward him, had visited him in his cubicle for 15-30 minutes which had made him uncomfortable, and had interrupted one of his telephone calls. He claimed that Fant embarrassed him in front of coworkers by publicly criticizing his work, harassed him about a trainee's work, and told lies about him to other employees. He also complained that Hoover had raised his voice in a recent meeting. Chism and Kelly interviewed other employees in the departments of Fant and Dominic to see if they had noticed any retaliation and reviewed Fant's written response denying Dominic's claims of retaliation. They concluded that Dominic disagreed with Fant's management style, but that Fant had not been retaliating against him. They reported their findings to Dominic and asked him for more details about Fant's retaliation, but he did not provide them. Dominic then wrote a letter of complaint to the chief financial officer of Pentair, Tom DeWitt, alleging its subsidiary was using irregular accounting practices. An investigation into these particular allegations did not verify Dominic's claims.

In late June 2004 Pentair hired the law firm of Leonard, Street, and Deinard to review the company's own internal investigation and to conduct an additional investigation into Dominic's allegations of sexual harassment and retaliation. The record reflects that Leonard, Street, and Deinard is a law firm headquartered in Minnesota with extensive experience with employment discrimination claims. The firm attorneys undertook their investigation by reviewing the files on record, asking Fant to provide another response to Dominic's allegations of retaliation, and conducting additional employee interviews. Their investigation concluded that the company's investigation had been adequate, that Dominic's harassment complaint did not show he had experienced a hostile work environment, and that there was no evidence of unlawful retaliation.

Kelly wrote a letter to Dominic informing him of the results of the study by the outside firm, and directed Hoover to set up sexual harassment training, to arrange mandatory supervisor training classes for Fant, and to speak with Fant daily about her communications with Dominic. Since Dominic objected to further contact with Kelly, management made arrangements for him to report to a human resources manager in a separate subsidiary of Pentair who had no previous association with the plant.

From late June until August, Dominic was placed on special paid assignment and worked at home with full pay. Tom DeWitt wrote a letter to Dominic on July 27, explaining that his home assignment would end and that he would be returning to the office in early August. DeWitt also told Dominic that Fant would be required to transmit all of his assignments via email and that these emails would be monitored by John Uitz, the plant's previous comptroller, to ensure that no retaliation occurred.

Dominic returned to work on August 3 and attended a sexual harassment training session required of all salaried employees. He claims that Chism commented during the session about his "dislike of sexual harassment laws" and that Chism used hypotheticals similar to Dominic's own experience as examples of discrimination. He claims that after the session employees made jokes about it, grabbed each other's breasts, performed pelvic thrusts against one another, and simulated masturbation. Dominic also complains that upon his return he was required to meet impossible deadlines. Dominic was not in the office after August 5 until December due to vacation, medical leave, and another home work schedule.

Dominic met with psychiatrist Dr. Stanley Rest on August 5. Dr. Rest recommended he seek a transfer or leave the company. Dominic's attorney sent the company a letter on November 3 requesting a transfer to a different plant. Kelly replied two days later that the company's accounting department was too small to be able to accommodate Dominic's transfer request. At that time the company was in a hiring freeze and was laying off hundreds of employees. Kelly asked Dominic for other suggestions that would assist him in returning to work. On November 30,

Dominic's attorney submitted a list of 26 written demands, including a request that Fant be removed as his supervisor, that he not be required to attend the department's daily meetings, that he would no longer be required to report or have personal contact with Chism, that several supervisors be required to "stay away from [him] altogether," and that neither Fant nor Chism be allowed to modify his work. The company denied several of these demands after determining that they were unreasonable and could not be met, but it sent Dominic a letter stating that communications between Fant and him would continue to be monitored, that he could address any complaints to the employee responsible for the monitoring, and that an alternative human resources contact had been arranged for him. Dominic resigned on December 11.

Dominic later filed this action asserting sexual harassment and retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e et seq., and the Arkansas Civil Rights Act, Ark. Code. Ann. §§ 16-123-101 et seq. His complaint also included state law claims for constructive discharge, negligent hiring, and negligent supervision. A jury trial commenced at the end of November 2005. The company moved for judgment as a matter of law at the close of the evidence, and the district court granted it as to the negligent hiring claim but denied it in all other respects. The jury returned a verdict in Dominic's favor for his claims for sexual harassment, retaliation, and negligent supervision, but found for the company on the wrongful discharge claim. It awarded Dominic $50,000 in compensatory damages on the negligent supervision claim, $50,000 in compensatory damages on the sexual harassment and retaliation claims, and $13,000 in lost wages and benefits on the retaliation claim. The jury additionally awarded $250,000 in punitive damages based solely on the Title VII sexual harassment and retaliation claims. After the district court determined that Dominic should recover $50,964.51 in attorney fees, judgment was entered in the total amount of $413,964.51.

The company filed a post trial motion for judgment as a matter of law or alternatively for a new trial or remittitur. One of the errors asserted in the motion was the submission of the issue of punitive damages to the jury. The court denied the

motion on August 4, 2006. The company appeals only the punitive damages award, arguing that the district court should not have submitted the question of punitive damages to the jury, particularly in light of its extensive good faith efforts to comply with Title VII.

We review the denial of a motion for judgment as a matter of law de novo, applying the same standard as the district court. Voeltz v. Arctic Cat, Inc., 406 F.3d 1047, 1050 (8th Cir. 2005). The motion should be granted if the responding party has been fully heard on an issue and a reasonable jury would not have a legally sufficient basis to find for that party on that issue. Fed. R. Civ. P. 50(a)(1). The evidence is viewed in the light most favorable to the jury verdict which should not lightly be set aside. Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc., 439 F.3d 894, 900 (8th Cir. 2006) (citation omitted). We reverse only when the evidence is not susceptible to any reasonable interpretation supporting the verdict. Warren v. Prejean, 301 F.3d 893, 900 (8th Cir 2002).

Punitive damages are appropriate for victims of Title VII if the plaintiff has shown that the employer engaged in intentional discrimination and acted with "malice or with reckless indifference" to the plaintiff's federally protected rights. 42 U.S.C. § 1981 a(b)(1); Kolstad v. American Dental Ass'n, 527 U.S. 526, 535 (1999). Malice and reckless indifference can be shown by demonstrating that an employer discriminated "in the face of a perceived risk that its actions will violate federal law." Id. at 536. This standard refers to the employer's state of mind regarding its knowledge that it "may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. at 535. Even if the plaintiff can show that individuals in the company demonstrated the requisite intent, punitive damages are only appropriate if such intent can be imputed to the employer. Id. at 539. When an employer promptly and conscientiously responds to complaints of harassment or discrimination with good faith efforts, punitive damages are not warranted. Id. at 545-46.

-8-

Dominic claims that the company did not make good faith efforts because the investigations it initiated were cursory and biased. Examples of cursory or biased investigations may be seen in Williams v. ConAgra Poultry Co., 378 F.3d 790, 796 (8th Cir. 2004) (employer terminated plaintiff instead of offender and took no action despite repeated complaints); MacGregor v. Mallinckrodt, Inc., 373 F.3d 923 (8th Cir. 2004) (employer conducted only minimal investigation, issued no reprimand to offender, and failed to communicate results of investigation to plaintiff); and Ogden v. Wax Works, 214 F.3d 999 (8th Cir. 2000) (employer conducted "cursory investigation" focused on plaintiff's performance rather than offender's behavior). Here, the company had a zero tolerance sexual harassment policy, and it sponsored a total of four investigations after Dominic made his complaint. None of the investigations revealed evidence that would have justified firing Fant. In their interviews, coworkers of Fant and Dominic were asked neutral questions which were open ended and not suggestive. The company also hired outside employment law specialists to look into whether its internal investigations had been proper and thorough and contracted with them to investigate Dominic's claims further. The outside specialists determined that the company's investigations had been thorough and confirmed the company's conclusions.

Dominic argues that it was unreasonable for Fant to remain as his supervisor. The company responds that the small size of the plant and of the accounting department made it impossible to accommodate his request for another supervisor unless it were to terminate Fant. Terminating her without more evidence would have exposed the company to legal action by her. Moreover, there were no further complaints by Dominic of any sexual harassment after the company took its actions in response to his initial complaint.

The company did far more in response to Dominic's complaint than the defendants in the cases cited by Dominic. In Williams, MacGregor, and Ogden, the defendants had ignored complaints, done cursory investigations, and focused their responses on the plaintiff's wrongdoing instead of the behavior of the alleged

offenders. The company's response here was more like that of the employer in <u>Carter v. The Kansas City Southern Railway Co.</u>, 456 F.3d 841 (8th Cir. 2006). In <u>Carter</u>, the employer had an antidiscrimination policy, conducted an immediate investigation once it was notified of harassment claims, and terminated the primary offender when the charges were substantiated. Dominic seeks to distinguish <u>Carter</u> on the basis that the offender in that case was ultimately fired. In contrast to the <u>Carter</u> employer, the company here did not uncover any information that corroborated Dominic's serious claims or provide it grounds to terminate Fant. As in <u>Carter</u>, it would be "illogical to ascribe malice or reckless indifference" to a company which responded appropriately to charges of discrimination. <u>Id.</u> at 847. We conclude that Dominic has not demonstrated that the company exhibited malice or reckless indifference toward their obligations under federal law in response his complaints of sexual harassment.

Dominic also contends that the company was reckless and malicious in responding to his claims of retaliation, but the record shows that it attempted to prevent retaliation by giving Fant a written warning explicitly listing examples of retaliation and explaining that she would be terminated if she took any of those actions against Dominic. The company quickly investigated and responded when Dominic complained about retaliation. It met with Fant to get her response to his allegations and limited direct communication between the two by requiring daily departmental meetings. Chism later interviewed Dominic's coworkers to gauge the effectiveness of these meetings. The company required Fant to put all of her assignments for Dominic in writing and assigned an employee who had once held Fant's job to monitor the assignments. Kelly directed Hoover to arrange for Fant to attend mandatory supervisor training classes and to speak to Fant daily to monitor her interactions with Dominic. Dominic was encouraged to report any incidents of retaliation, was given two special paid assignments that allowed him to work from home, and was provided an alternative human resources contact after he said he did not want to continue dealing with Kelly.

-10-

Chism, Hoover, and Kelly interviewed members of the departments supervised by Fant and Dominic several times as part of the investigation into his allegations and conducted follow up interviews with them to ensure that no retaliation occurred. When Chism, Hoover, and Kelly determined that some of Dominic's retaliation claims were conclusory, he was given the opportunity to furnish more information. At least one member of management reported the results of each investigation to Dominic and explained what actions would be taken to remedy his complaints and prevent future ones. After explaining why his request for a transfer could not be accommodated, Dominic was asked for other suggestions to assist him in returning to the office; he responded with a list of 26 demands.

Dominic urges that punitive damages were warranted because Fant, Chism, and Kelly all exhibited malice and reckless indifference and their states of mind should be imputed to the company. Malice or reckless indifference exhibited by employees working in a managerial capacity can be imputed to the employer if they were "acting in the scope of their employment." Kolstad, 527 U.S. at 541 (citing Restatement (Second) of Torts, § 909). An employer cannot be vicariously liable, however, for "discriminatory employment decisions of managerial agents where those decisions are contrary to the employer's good-faith efforts to comply with Title VII." Id. at 545. Dominic argues that Fant's behavior after being warned against retaliation is evidence of malice and reckless indifference toward federal sexual harassment law, as are Chism's comment during the sexual harassment training and Kelly's lack of response to his complaints and unwillingness to transfer him. Chism and Kelly's extensive efforts to respond to Dominic's complaint belie malice or reckless indifference on their part, and the company's good faith efforts to remedy Dominic's complaints of sexual harassment and retaliation by Fant would defeat any imputation of liability for her conduct. See id. at 541.

We conclude the company made sufficient good faith efforts regarding Dominic's claims to make punitive damages inappropriate. See id., see also Carter, 456 F.3d at 847-48. The company had a formal zero tolerance antiharassment policy,

-11-

and it launched thorough investigations in response to Dominic's complaints about sexual harassment, retaliation, and accounting irregularity. Plant management consulted with the company's human resources experts, Hoover at the Decatur facility and Kelly at corporate headquarters. Hoover and Chism drew up a set of neutral questions that was used in their first internal investigation. They consulted with counsel about the sufficiency and efficacy of their investigations. Although the investigations did not substantiate most of Dominic's claims, the company minimized communication between Fant and Dominic, kept a written record of those communications, granted Dominic's request to report to a human resources manager in a separate subsidiary, and offered him several accommodations, including an at home work schedule for two separate periods. Kelly also directed Hoover to require Fant to participate in a supervisor training session and to organize sexual harassment training for all salaried employees.

In sum, the company demonstrated good faith efforts to respond to Dominic's complaints, to prevent sexual harassment and retaliation, and to fulfill its obligations under Title VII. We conclude that on this record punitive damages should not have been submitted to the jury.

Accordingly, we reverse and remand to the district court for modification of the judgment consistent with this opinion.

_____