# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 00-3943
No. 00-3992

———————

Timothy L. Moysis,

    Appellee/Cross Appellant,

      v.

DTG Datanet, formerly known as
Futuristic, Inc., formerly doing business
as Computerland, Inc.,

    Appellant/Cross Appellee.

\* Appeal and Cross Appeal from the
\* United States District Court for the
\* District of South Dakota.

———————

Submitted: October 15, 2001
Filed: January 29, 2002

———————

Before BOWMAN, BRIGHT, and HANSEN, Circuit Judges.

———————

BRIGHT, Circuit Judge.

    DTG Datanet (Datanet) appeals from a judgment of the district court[1] entered upon a jury verdict in favor of Timothy Moysis on his federal claim under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-213, and his state claim

———————

[1]The Honorable Andrew W. Bogue, United States Senior District Judge for the District of South Dakota.

of intentional infliction of emotional distress.  On appeal, Datanet challenges the district court's denial of its motion for judgment as a matter of law (JAML), new trial, or for remittitur and the award of attorney fees.  Moysis cross-appeals the district court's denial of his post-trial motion for front pay.  We affirm.

## I.      BACKGROUND

We set forth the facts in the light most favorable to the jury's verdict.  Moysis began working for Datanet in South Dakota in February 1992 as a systems administrator, which involved maintaining and updating the company's computer, telephone, and information systems.  In 1994, he was promoted to systems engineer, which required him to maintain and update systems for Datanet clients.  In a November 1995 performance evaluation, Mike Monson, Moysis' supervisor, rated Moysis as overall exceeding job requirements and recommended that he obtain a computer specialty certification.  After enrolling in a company-paid training program, Moysis received the certification in April 1996.  According to its policy, Datanet only provided such training to "employees who have met high standards in their positions and are willing to make a commitment in return for training that will make them more valuable as an employee to [Datanet]."  In a May 1996 evaluation, Monson noted that Moysis had a "great wealth of knowledge that he brings to the job" and "work[ed] hard to provide quality service to the clients."  In addition to positive performance reviews, Moysis received bonuses and merit raises every six months.  On May 9, 1996, Monson  recommended that Moysis receive a merit raise, which was approved to be effective as of  May 1, 1996.

Also on May 9, while returning from a customer site, Moysis was involved in an automobile accident.  Following the accident, Moysis was in a coma for six days. Brain scans showed injury to the frontal lobes, which control an individual's personality, emotional responses, impulse control, social abilities, and speech. During this time, his mother, Shirlie Hoag, kept Datanet informed of his condition.

Monson, Dave English, a co-owner of Datanet, and other Datanet employees visited Moysis in the hospital. In addition, while Moysis was hospitalized, seven co-workers helped his relatives finish a painting project on his home.

During one of his first conscious moments, Moysis called Datanet's dispatcher for a job assignment. Moysis' mother continued to keep Datanet up to date on Moysis' condition. During a hospital visit in early July, Moysis told Monson and English he wanted to return to work when he completed rehabilitation, which he thought would take about six months. After two months in the hospital, on July 9, Dr. Susan Assam, who followed Moysis while in the hospital, discharged him to live with his mother and to outpatient therapy. On the way home from the hospital, Moysis and his mother stopped by Datanet to thank the employees for their support. On July 11, Moysis wrote a letter to friends and relatives to update them on his condition. In a paragraph of the letter addressed to co-worker Patty Frantz, Moysis discussed a hug she had given him during his visit to Datanet, noting "those two things" and a "tushy touch." Frantz did not raise a work-related complaint about the letter or even show or talk about it to Monson or English.

In August 1996, at the suggestion of his rehabilitation team, Moysis enrolled in a brain injury program in Colorado. As part of the program, Moysis participated in work therapy, where he was placed in computer-related assignments. In October 1996, Moysis was discharged to live independently, but to continue work therapy. He returned to South Dakota and continued in work therapy, working with computers under the supervision of his rehabilitation counselor, Mary Olson, and her husband. On December 2, Monson telephoned Moysis, asking when he could return to work. Moysis responded that he would know more the next day after he met with Olson and his doctor. At the meeting, Dr. Assam released Moysis to work at Datanet on a part-time basis, with a gradual increase to full-time. After the meeting, Olson and Moysis went to Datanet to meet with Monson and English, who both expressed concerns about Moysis' return to work. Olson told them if there were problems she was there

to help.  Monson and English asked Moysis to step out of the room and reiterated their concerns to Olson, asking whether Moysis would act appropriately and had the ability to communicate with others.  At the conclusion of the meeting, Moysis and Olson asked English and Monson about when he could start and what activities he could perform.

On December 9, Monson called Moysis to tell him about a job with another company in Colorado.  Moysis responded that he wanted to return to work at Datanet, asking when he could start.  Monson told him to come in the next day.  In anticipation of the meeting, Moysis made a list of projects he could do.  At the December 10 meeting, instead of discussing a return to work, English told Moysis he was being terminated because of client and co-worker complaints.  English further told Moysis he had planned on firing him the day of the accident, but did not do so in order to continue his benefits.  As Moysis was leaving the office, English also stated "there was this letter thing, too," apparently referring to the July 11 letter.

After the termination, Moysis became depressed, threatened suicide, and was hospitalized in a psychiatric unit on two occasions.  By December 1997, he had improved and was working as a computer systems administrator, but was earning one-third less than he made at Datanet.

At trial, in addition to his testimony and that of his mother, doctor, and Olson, Moysis offered deposition testimony of Dr. Michael McGrath, a clinical psychologist. Dr. McGrath, who had evaluated Moysis in November 1998, testified that as a result of the accident Moysis had permanent cognitive impairments, which included difficulty with new situations, memory, and reasoning. McGrath explained that as of December 1996 the impairments would have adversely affected Moysis' ability to work in unfamiliar surroundings because he "didn't have responses stored away in his brain."  Dr. McGrath believed Moysis would have fewer problems if he returned to Datanet since he was familiar with the routine, structure, and people.

Monson and English testified for Datanet. Both claimed that about a week before the accident they had decided to terminate Moysis because of customer and co-worker complaints. They further claimed that they had planned to tell Moysis the day of the accident, but delayed doing so in order to continue his benefits during his rehabilitation. Datanet introduced a memo allegedly written on April 13, 1995 by Monson addressed to Moysis about "problems on the job." The memo stated that as a result of a complaint by "Dennis" about a scheduling problem, Moysis was placed on probation and would not receive an April bonus. On cross-examination, however, Monson could not recall if Moysis had been given the memo and admitted that the memo was not reflected in the November 1995 performance evaluation and that Moysis had been given a bonus in April. Monson also could not explain why he had given Moysis a positive performance evaluation on May 7, 1996 and recommended a merit raise two days later, if he and English had already decided to terminate Moysis. On cross-examination, English could not remember the names or number of clients who had allegedly complained or remember what was discussed at the December 3 meeting with Olson and Moysis. English also denied that he had mentioned the July 11 letter to Moysis as a reason for termination.

The jury awarded Moysis $45,993.27 in back pay and $60,000 in compensatory damages on his ADA claim and $200,000 on his intentional infliction of emotional distress claim. Datanet moved for judgment as a matter of law, a new trial, or remittitur. Except for reducing the compensatory damage claim to $50,000 to comply with the ADA statutory cap, see 42 U.S.C. § 1981a(b)(3), the district court denied the motion. The court rejected Datanet's arguments concerning the sufficiency of the evidence and offsetting the ADA back pay award with worker's compensation payments Moysis had received from Datanet's insurance carrier. In a later order, the court denied Moysis' motion for front pay and request for a hearing. The court noted that because Moysis had failed to file a supporting argument, it assumed that he had abandoned the motion. In any event, the court stated that in light of the jury awards of back pay and compensatory damages, an award of front pay would be an

unnecessary windfall. The court awarded Moysis' request for attorney fees and expenses for $63,733, based on an hourly rate of $150 an hour.

## II.   DISCUSSION

### A.   Judgment as a Matter of Law

On appeal, Datanet argues that the district court erred in denying its motion for judgment as a matter of law, asserting there was insufficient evidence supporting the ADA and intentional infliction of emotional distress claims.  We review the district court's denial of the motion de novo.  Webner v. Titan Distrib., Inc., 267 F.3d 828, 833 (8th Cir. 2001).  We must affirm the jury's verdict unless, after viewing the evidence in the light most favorable to Moysis, we conclude that no reasonable jury could have found in his favor.  Id.

#### 1. ADA

To prove his ADA claim, Moysis had to show he was disabled, qualified to perform the job, and was terminated because of his disability.  Datanet first argues that Moysis presented insufficient evidence of a disability.  Although the ADA defines disability to include an actual disability, a perceived disability, or a record of a disability, Otting v. J.C. Penney Co., 223 F.3d 704, 708 (8th Cir. 2000), the district court only instructed the jury on actual disability.  Thus, Moysis was required to show that he had an "impairment that substantially limits one or more of the major life activities."  42 U.S.C. § 12102(2)(A).  An impairment is substantially limiting if an individual is "[s]ignificantly restricted as to the condition, manner or duration under which . . . the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(ii).

Datanet does not challenge that working is a major life activity.  See 29 C.F.R. § 1630.2(i).  Rather, Datanet, argues that to be disabled a person must be "precluded from working generally."  Its argument is without merit.  The Supreme Court has made it clear that the ADA "addresses substantial limitations on major life activities, not utter inabilities."  Bragdon v. Abbott, 524 U.S. 624, 641 (1998).  A person is substantially limited in working if he or she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i)).  Because disability is determined on a case-by-case basis, "[a] court must ask whether the particular impairment constitutes for the particular person a significant barrier to employment."  Webb v. Garelick Mfg. Co., 94 F.3d 484, 488 (8th Cir. 1996) (internal quotation omitted).

Viewing the evidence in the light most favorable to Moysis, we conclude that he presented sufficient evidence of an actual disability at the time of his December 1996 termination.  At that time, Dr. Assam had only released Moysis to work at Datanet on a part-time basis.  Both she and Dr. McGrath testified that although Moysis would be able to work at Datanet, jobs requiring new skills and meeting new people could pose problems.  Moysis testified that as a result of the brain injury, he continued to have concentration and short-term memory problems.  As the Seventh Circuit has noted in another brain-injury case, "the need for routine," as well as "memory, concentration, and interacting with others [are] activities that feed into the major life activities of learning and working."  Emerson v. Northern States Power Co., 256 F.3d 506, 511, 512 (7th Cir. 2001).  Moreover, "[t]his is not a case, then, in which plaintiff's condition causes difficulty with a single aspect of a single job position."  Maziarka v. Mills Fleet Farm, Inc., 245 F.3d 675, 680 (8th Cir. 2001).  Rather, Moysis' limitations resulting from his brain injury "translate across a broad spectrum of . . . jobs."  Webner, 267 F.3d at 834.  Thus, the jury could reasonably find

that Moysis' impairments were long-term and substantially limited his "real work opportunities." Webb, 94 F.3d at 488.[2]

Datanet does not dispute that Moysis was a qualified individual, but argues there was insufficient evidence that it terminated him because of a disability. Its argument borders on the frivolous. Moysis was a valuable employee to Datanet and would not have been fired but for his disability. Moysis' performance evaluations overall showed he exceeded job requirements. He always received merit raises, including one the day of his accident. About a month before the accident, Moysis received a certification in a computer specialty, after completing company-paid training. Datanet only provided such training to employees "who have high standards in their positions" and were "willing to make a commitment [to Datanet] in return for training." In fact, if an employee left Datanet within a year of receiving such training, he or she was required to reimburse Datanet for the cost of the training.

Although Datanet notes the April 13, 1995 memo in which Monson allegedly placed Moysis on probation because of a co-worker complaint, the jury was entitled to conclude that the memo was "manufactured post-hoc to support a non-discriminatory explanation" for the termination." Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 834 (8th Cir. 2000). Monson admitted that the memo, which Moysis never saw, was not reflected in the positive November 1995 performance evaluation and that Moysis in fact received an April bonus. Datanet spends much time on appeal, as it did before the jury, arguing that the July 11, 1996 letter in which Moysis had discussed hugging Frantz provided an additional reason

_____

[2]This case is clearly distinguishable from the recent Supreme Court case of Toyota Motor Mfg., Ky., Inc. v. Williams, No. 00-1089, 2002 WL 15402 (U.S. Jan. 8, 2002). In Toyota Motor, the plaintiff suffered from carpal tunnel syndrome which limited her ability to perform manual tasks. The Court held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Id. at *9.

for termination. The jury was entitled to discredit that argument. Both Monson and English admitted that they had never read the letter, which was written two days after Moysis was released from the hospital. Indeed, English discounted the letter as a reason for termination, testifying he had never mentioned the letter to Moysis at the December 10 meeting. Moreover, Frantz testified that she never discussed the letter with Monson or English and never raised a work-related complaint about it.

Thus, the jury could reasonably conclude from the evidence that Datanet fired Moysis on December 10, 1996, because of his disability. Monson and English failed to explain why they had given Moysis a merit raise on May 9 if they had decided to terminate him a week earlier. Nor could they explain why they met with Olson and Moysis on December 3 to discuss his return to work, if the termination decision had been made six months earlier. In addition, English fired Moysis just one week after the meeting in which he expressed his fear of Moysis' return to work following his brain injury. Although timing alone may be insufficient to raise an inference of discrimination, coupled with "other circumstances [that] are inferential proof of overt discrimination," suspicious timing can support a finding of discrimination. Kells, 210 F.3d at 835. Such is the case here.

## 2. Intentional Infliction of Emotional Distress

Datanet first argues that Moysis could not recover under state law his claim for intentional infliction of emotional distress because he was only complaining about the fact of termination. We disagree. Moysis was seeking damages under this claim because of the manner of his termination. We also disagree with Datanet that the manner of termination did not give rise to liability. Datanet relies on Richardson v. East River Elec. Power Coop., Inc., 531 N.W.2d 23 (S.D. 1995). In that case, the South Dakota Supreme Court held that a plaintiff's intentional infliction of emotional distress claim arising from a termination failed because the manner of termination was not "so extreme in degree as to go beyond all possible bounds of decency, and

to be regarded as . . . utterly intolerable in a civilized community." Id. at 27 (internal quotation omitted). His reliance is misplaced. Although in South Dakota the tort of intentional infliction of emotional distress includes extreme and outrageous conduct, as the court in Richardson recognized, the tort also "includes reckless conduct resulting in emotional distress." Id. To establish reckless conduct, a plaintiff must show that a defendant "recklessly acted in a manner which would create an unreasonable risk of harm to him, and that [defendant] knew or had reason to know of facts which would lead a reasonable man to realize that such actions would create the harm that occurred." Wangen v. Knudson, 428 N.W.2d 242, 248 (S.D. 1988).

For example, in Wangen, a supervisor falsely told a plaintiff that he was fired after he refused the supervisor's order to participate in an alcohol treatment program. Because the supervisor knew that the plaintiff was suffering from and had been hospitalized for depression, the court upheld a jury award for intentional infliction of emotional distress in favor of the plaintiff, whose depression had worsened following the incident. The court explained that because liability arises "from the actor's knowledge that the other is particularly susceptible to emotional distress by reason of some physical or mental condition or peculiarity[,] . . . [a]ctions which may not make [him] liable in one situation may make him liable in another." Id. In Richardson, although the court noted that "a person whose employment is terminated by discharge will likely be upset," 531 N.W.2d at 29, unlike Wangen and this case, there was no evidence that the employer knew that the plaintiff was "particularly susceptible to emotional distress by reason of some physical or mental condition or peculiarity." Wangen, 428 N.W.2d at 248.

We also note the case of Petersen v. Sioux Valley Hosp. Ass'n, 486 N.W.2d 516, 519 (S.D. 1992). In that case, the state supreme court held that a plaintiff had made a submissible case of intentional infliction of emotional distress based on a supervisor's conduct in failing to warn her about a meeting at which she had to confront co-workers' complaints. Because the plaintiff previously had told the

-10-

supervisor about her fear of confrontational group meetings, the court held a jury could find the supervisor's conduct "reckless in view of her nature and condition." Id. at 519. On rehearing, the state supreme court clarified the law regarding the tort of intentional infliction of emotional distress. The court adhered to Wangen, reaffirming that the tort "encompasses liability for reckless infliction of emotional distress as stated therein." Petersen v. Sioux Valley Hosp. Ass'n, 491 N.W.2d 467, 469 (S.D. 1992).

Viewing the evidence in the light most favorable to Moysis, we conclude that sufficient evidence supported the jury's verdict in favor of Moysis on his intentional infliction of emotional distress claim. Both Monson and English had knowledge of Moysis' condition, his strong desire to return to work at Datanet, and the problems he would face in a new work setting. In addition, their actions led Moysis to believe he could return to his work at Datanet, which was his goal throughout rehabilitation. Yet despite their knowledge and their actions, Monson and English fired Moysis just one week after the meeting with him and Olson to discuss returning to work at Datanet. Also, and importantly, in firing Moysis, they lied to him by manufacturing reasons about his inability to get along with co-workers and clients, the area in which they knew Moysis was vulnerable. In order to successfully return to work, Moysis needed all the confidence he could muster. After the meeting, although Moysis attempted to work, he encountered difficulties. He began to second-guess his abilities and believe his rehabilitation was for naught. He became so depressed that he believed he would have been better off dead. Based on Wangen and Petersen, we determine sufficient evidence existed for a jury to conclude that Datanet's actions "sufficiently demonstrate[d] a reckless disregard of a high probability that [Moysis] would suffer emotional distress." Wangen, 428 N.W.2d at 248.

## B.    Damages

On appeal Datanet raises several arguments concerning the damage awards. It first argues that the district court erred in rejecting its offered instruction that the jury could not return a verdict both for compensatory damages on the ADA claim and an award for the intentional infliction claim.  The court did not err.  Contrary to Datanet's suggestion, the two awards do not constitute a double recovery for the same injury.  The ADA award compensated for emotional distress arising from the fact of termination.  See Webner, 267 F.3d at 836 (plaintiff's testimony can be sufficient to prove compensatory damages for emotional distress under the ADA).  The award of damages under the intentional infliction of emotional distress reflected the severe depression that ensued from the manner of termination.   See id. (upholding compensatory damage awards for emotional distress under ADA and state claim).

We also reject Datanet's argument that the district court erred in failing to deduct worker's compensation benefits paid by an insurance company from Moysis' back pay award.  In Gaworski v. ITT Comm. Fin. Corp., 17 F.3d 1104, 1112 (8th Cir.), cert. denied, 513 U.S. 946 (1994), this court stated that "'an employer can not set up in mitigation of damages in a tort action by an injured employee indemnity from a collateral source, such as insurance or compensation or benefits under a Workmen's Compensation Act, even where the defendant has contributed to the fund.'" (quoting Chicago Great W. Ry. v. Peeler, 140 F.2d 865, 868 (8th Cir. 1944)). We then applied the "collateral source rule" and refused to deduct unemployment benefits from a back pay award in an age discrimination action, noting the rule "gains in significance in the context of employment discrimination claims."  Id.  We explained this is so because back pay awards not only serve to make a victim whole, they also "deter future discrimination." Id. at 1113.  If the unemployment benefits were deducted, this court reasoned that it would be "less costly for the employer to wrongfully terminate a protected employee." Id.  Put another way, deduction of the

benefits would constitute "a windfall to the employer who committed the illegal discrimination." Id. The same reasoning applies in the circumstances of this case. See Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1171 (6th Cir. 1996) ("Like unemployment benefits, worker's compensation benefits are a collateral source that should not be deducted from back pay."), amended on other grounds, 97 F.3d 833 (6th Cir. 1996).

## C.      Attorney Fees

Datanet argues that the district court abused its discretion in finding that $150.00 an hour was a reasonable hourly rate, asserting that the court was bound to accept Moysis' counsel's customary rate of $100.00. Although a counsel's customary rate might be some evidence of a reasonable rate, it is not controlling. See Jaquette v. Black Hawk County, 710 F.2d 455, 458 (8th Cir. 1983). As a general rule, a reasonable hourly rate is the prevailing market rate, that is, "the ordinary rate for similar work in the community where the case has been litigated." Emery v. Hunt, No. 01-1459, 2001 WL 1548860, at *5 (8th Cir. Dec. 6, 2001). "We are especially reluctant to substitute our judgment for that of the district court in the matter of appropriate attorney's fees, because the district court is in the best position to determine" the issue. United States v. Big D Enter., Inc., 184 F.3d 924, 936 (8th Cir. 1999) (quoting Collins v. Burg, 169 F.3d 563, 565 (6th Cir. 1999), cert. denied, 529 U.S. 1018 (2000)). The district court gave careful consideration to the fee request, including rates in comparable cases and counsel's experience and skill, and acted well within its discretion.

## D.      Cross-Appeal--Front Pay

Moysis argues that the district court erred in denying his motion for front pay. Front pay is an equitable remedy committed to the sound discretion of the district court. See Excel Corp. v. Bosley, 165 F.3d 635, 639 (8th Cir.1999). In this case, the

court did not abuse its discretion. At trial, Moysis testified to factors that are relevant to the issue of front pay inquiry, such as the "ability to obtain employment with comparable compensation and responsibility." EEOC v. HBE Corp., 135 F.3d 543, 555 (8th Cir. 1998). The district court concluded that in light of current employment by Moysis and back pay and compensatory awards, an award of front pay would be an unnecessary windfall to Moysis. See Standley v. Chilhowee R-IV Sch. Dist., 5 F.3d 319, 322 (8th Cir. 1993) (in determining whether front pay is appropriate, a court "must attempt to make the plaintiff whole, yet the court must avoid granting the plaintiff a windfall").

Contrary to Moysis' argument, the district court was not required to hold a hearing on the motion. Although Moysis requested a hearing, he did not offer the court any reason why a hearing was necessary. See Davoll v. Webb, 194 F.3d 1116, 1142 (10th Cir. 1999) (district court did not abuse its discretion in denying defendant's request for a hearing on front pay because of the lack of showing a hearing was justified); see also Bruso v. United Airlines, Inc., 239 F.3d 848, 862 (7th Cir. 2001) ("A plaintiff who seeks an award of front pay must provide the district court with the essential data necessary to calculate a reasonably certain front pay award.") (internal quotation omitted); Thurman v. Yellow Freight Sys., Inc., 97 F.3d at 833 (plaintiff waived issue of front pay by first raising it in a motion to alter or amend the judgment).[3] Moreover, the record does not show the essential data necessary to support a front pay award.

---

[3]The district court did not abuse its discretion in denying Moysis' Fed. R. Civ. P. 59(e) motion, in which he sought to submit a brief on the issue of front pay. "Arguments and evidence which could, and should, have been raised or presented at an earlier time in the proceedings cannot be presented in a Rule 59(e) motion." Johnson v. Chater, 108 F.3d 942, 945-46 n.3 (8th Cir. 1997).

## III. CONCLUSION

We have considered Datanet's other arguments and they are without merit. Accordingly, we affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.