# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 07-2851/07-3030

_____

Edward D. Heaton,

        Appellee,

v.

The Weitz Company, Inc.,

        Appellant.

\* \* \* \* \* \* \* \* \* \* \*

Appeals from the United States
District Court for the Northern
District of Iowa.

_____

Submitted: April 18, 2008
Filed: July 24, 2008

_____

Before WOLLMAN, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Edward Heaton (Heaton) filed suit against The Weitz Company, Inc. (Weitz) alleging he was retaliated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, et seq. (Title VII) and 42 U.S.C. § 1981a. A jury found in favor of Heaton on his retaliation claim, and awarded Heaton $137,070.44 in compensatory damages, including an award of $73,320.00 for emotional distress. The jury also awarded Heaton $25,000.00 in punitive damages.

Weitz moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a) (Rule 50). The district court[1] denied this motion, and granted an award of attorney fees. Weitz appeals, contending the district court erred in (1) denying Weitz's Rule 50 motion on Heaton's retaliation claim; (2) submitting punitive damages to the jury and denying Weitz's Rule 50 motion on punitive damages; (3) finding Heaton presented sufficient evidence to support the jury's award of damages for emotional distress; and (4) awarding attorney fees of $85,446.90. We affirm.

## I.   BACKGROUND

Heaton, a man of partial Hispanic descent, became a journeyman ironworker in 1992. In 2000, Heaton became a member of an ironworkers union. In October of 2000, Heaton began working for Weitz as a journeyman ironworker. Heaton was progressively promoted to foreman, general foreman, and finally superintendent ironworker in January of 2003. Weitz Vice President, Michael Novy (Novy), promoted Heaton to the superintendent ironworker level. Heaton reported directly to Novy.

In March or April of 2003, a union (affiliated with the Teamsters) superintendent, Noel Huber (Huber), instructed some of the Teamsters to go to Heaton, tell him he was a "fucking spic," and ask Heaton "if [Heaton] knew what a '[s]pic' was." Other workers told Heaton they heard Huber say, "The only thing worse than having [his] daughter marry a fucking nigger would be to have [his] daughter marry a fucking [s]pic like that Ed Heaton." Heaton complained to Weitz's Human Resources Department, specifically Chantry DeVries (DeVries), about Huber's comment. DeVries was Weitz's personnel benefits manager, had attended training on state and federal anti-discrimination laws, and was listed in Weitz's policies as the contact person for making discrimination complaints. Heaton asked

---

[1]The Honorable Linda R. Reade, Chief Judge, United States District Judge for the Northern District of Iowa.

that Weitz take action to stop the discriminatory behavior, and specifically requested that Novy not be informed about the complaint because Heaton believed Novy and Huber were friends outside of work, attended the same church, and Novy was very defensive of Huber. Heaton also told DeVries he was worried he might be retaliated against, by losing his promotion or his job.

Despite Heaton's request, DeVries assigned the complaint to Novy for investigation. Novy told Heaton that DeVries had contacted him about the situation. Novy also informed Heaton that Novy had not known about Heaton's Spanish and Italian background. When Heaton asked if his racial background mattered, Novy did not respond. About a week after Heaton made the complaint, Novy informed Heaton that Novy let Huber go but hated to do so. Novy had determined Huber made the racially offensive comments, and offered Huber a demotion or early retirement. Huber chose early retirement.

A few weeks after Huber elected to take early retirement, Heaton and Brian Henecke (Henecke) discussed unloading equipment off trucks at a job site for Quaker Oats, where Henecke was project manager. After some disagreement, they agreed a crew composed of ironworkers and millwrights should unload the trucks the next day. Henecke instructed Heaton to go to the Quaker Oats job site the next day. On May 28, 2003, at the Quaker Oats job site, Henecke called Heaton a "spic" during an argument about who was to unload the trucks.

Such jurisdictional disputes rarely result in termination. When Novy learned of the dispute, without waiting to hear Heaton's side of the disagreement, Novy informed Heaton he was terminated because Henecke wanted him fired and because Heaton was "acting like a fucking union steward." Heaton had never been in trouble before at Weitz. Novy already had prepared Heaton's last two paychecks. When Heaton asked if he was being fired due to the Huber complaint, Novy immediately revoked the termination, retracted the checks, and gave Heaton "a second chance."

Novy instead told Heaton he would not be allowed to work on projects with Henecke until Heaton apologized to Henecke. Heaton apologized and was again assigned to a job with Henecke.

Heaton started another assignment at the Quaker Oats plant. Without advanced warning to Heaton, Henecke removed two of Heaton's workers from his crew— Heaton's "two right hand men." Henecke stated he removed these men from the job because they could not pass Quaker Oats's background check. However, the two men had worked at the Quaker Oats job site previously. After being terminated from this job, one of the men successfully obtained security clearance at a nuclear power plant. The removal of these two crew members caused Heaton to fall behind schedule.

After Heaton completed the Quaker Oats job, he was supposed to begin working on a project at General Mills. Novy reassigned the General Mills job to a different superintendent. When Heaton asked Novy about the General Mills job, Novy told Heaton that Novy was demoting Heaton to journeyman, or Heaton could choose to be laid off. Heaton asked why he was being demoted, and Novy told Heaton, "Things are catching up to you." Heaton elected to be laid off, because the demotion would leave him with significantly fewer job protections. Novy required Heaton to turn in his company truck, tools and cell phone, even though other superintendents typically retained these items while temporarily laid off. Other superintendents continued to work, even as a slower period ensued, even if the assignments were just doing "busywork." Weitz also keeps superintendents working by having them do odd jobs in its warehouses, such as building shelves or organizing equipment at the Weitz warehouse. Superintendents did not usually do labor, but when the work was slow at Weitz, one superintendent traditionally would be doubled-up with another superintendent, and the former would do labor rather than supervise, in order to avoid layoff.

Heaton again contacted DeVries in Weitz's human resources department, informing her of the situation and stating he felt he was being retaliated against by Novy because Heaton had made the discrimination complaint against Huber. DeVries told Heaton she had been informed that Heaton had been offered work three or four times, but that Heaton had declined the work. Heaton told DeVries this was not true, and rhetorically asked, "Why did Mike Novy have me return my truck if this is true?" DeVries investigated and was told a superintendent named Matt Kula (Kula) offered Heaton the purported work at the Cargill project. Heaton denied this, and specifically informed DeVries, "Henecke is the project manager for Cargill, and Matt Kula is the superintendent. Matt [Kula] has told [another employee] many times that Brian Henecke would not let me work at Cargill." DeVries did not investigate this claim.

Although Heaton had only been offered the multiple-level demotion to journeyman, DeVries did not look into the matter further because, "In [her] opinion, it was work, so [she] didn't get into what kind of work it was." This ignored the fact that, if a superintendent is laid off at Weitz, that employee would normally come back to work after the layoff as a superintendent, and the journeyman position provided little job security, because journeymen were the first to be terminated. After the offer to work as a journeyman, management level positions opened up, but Heaton was not offered those positions. Finally, even though Heaton specifically alleged retaliation from Novy, DeVries assigned Novy to investigate the complaint.

At trial, Heaton testified, following his termination, he felt "inadequate" and had no sense of identity, and his reputation in his business was harmed. Heaton went to a psychologist and to a family counselor for help, and he began taking antidepressant medication, which he continued to take at the time of trial. Heaton eventually found work as a skilled mechanic with another company.

## II.    DISCUSSION

We review a district court's denial of a motion for judgment as a matter of law de novo.  See Moysis v. DTG Datanet, 278 F.3d 819, 824 (8th Cir. 2002).  We "must affirm the jury's verdict unless, after viewing the evidence in the light most favorable to [Heaton], we conclude that no reasonable jury could have found in his favor."  Id. (citation omitted).  "[W]e review the district court's decision to grant or deny judgment as a matter of law with great deference to the jury's verdict."  Wilson v. Brinker Int'l, Inc., 382 F.3d 765, 769 (8th Cir. 2004) (citation omitted).  We "will not set aside a jury verdict unless there is a complete absence of probative facts to support the verdict."  Id. (citation and internal quotation marks omitted).  "We review the district court's award of attorney fees for abuse of discretion."  Ollis v. HearthStone Homes, Inc., 495 F.3d 570, 576 (8th Cir. 2007) (citation omitted).

### A.    Retaliation

Weitz contends the district court erred in denying its motion for judgment as a matter of law on Heaton's retaliation claim, arguing there was insufficient evidence for a reasonable jury to find any causal connection between Heaton's discrimination complaint and either Weitz's decision to lay Heaton off or not to rehire Heaton.  In support of its argument, Weitz points to Sims v. Sauer-Sundstrand Co., 130 F.3d 341 (8th Cir. 1997).  Sims reiterates the proposition that "the passage of time between events does not by itself foreclose a claim of retaliation; rather, it weakens the inference of retaliation that arises when a retaliatory act occurs shortly after a complaint," Id. at 343 (internal alterations and citation omitted).  In Sims, more than one year passed between the time of the protected activity and the time of the alleged retaliation.  Id. at 343-44.  Sims provided virtually no other evidence of a causal connection.  Id.  The claim in Sims was based upon little more than speculation the adverse employment action was related to the protected activity.

In Heaton's case, Weitz essentially asks us to determine the evidence fails to *strongly* demonstrate causation.  We will not substitute our judgment for that of the

jury when sufficient evidence exists for the jury to make a reasonable determination. See Wilson, 382 F.3d at 770. Weitz argues six months passed between the time of Heaton's discrimination complaint and the time Heaton was laid off. But all was not well during this six month period. Only a few weeks after Huber was let go, a turf dispute arose between Heaton and Henecke, who used to work with Huber. The district court noted such disputes were "common in the industry." Even though such disputes were common, Novy (an admitted friend of Huber and his family) informed Heaton he was being terminated, and handed Heaton his last two paychecks. Heaton asked if he was being fired because of his discrimination complaint, and Novy promptly revoked the termination. Novy then demanded Heaton apologize to Henecke, even though Henecke was the one who called Heaton a "spic" during the dispute. Later, when Heaton was laid off, Novy told Heaton, "Things are catching up to you."

Finally, Weitz had a history of allowing superintendent ironworkers, like Heaton, to maintain their titles during slow periods, while performing labor instead of supervision, in order to avoid layoffs. This option was not offered to Heaton. A reasonable jury could find, as the district court articulated, "there was a pattern of adverse actions against [Heaton] beginning shortly after the time he complained . . . and lasting until the time he was laid off. (citing Hite v. Vermeer Mfg. Co., 446 F.3d 858, 866 (8th Cir. 2006) (explaining, "A pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement." (citation omitted))).

Although the temporal proximity between the protected activity and the alleged retaliatory act must generally be "very close," see Hite, 446 F.3d at 866, the "employee may attempt to shorten the gap between [the] protected activity and the adverse action by showing that shortly after [the employee] engaged in the protected activity, the employer took escalating adverse and retaliatory action against [the employee]." Id. (citation, alterations, and internal quotation marks omitted). Weitz

argues some of the "pattern" actions listed by the district court were not particularly strong. For example, Weitz notes there was no evidence Henecke ever knew Heaton had filed a discrimination complaint. However, a reasonable jury could infer Henecke knew, given that Henecke managed the job site where Huber last worked. More importantly, Novy certainly knew of Heaton's complaint, and it was Novy who attempted to fire Heaton on the basis of the conflict between Henecke and Heaton.

Weitz claims when Henecke removed workers from Heaton's assignment at Quaker Oats, thus increasing Heaton's stress and workload, Weitz had to do so based upon the requirements of the contracting company. This may well indicate that particular incident was not retaliatory. But these two workers had worked at Quaker Oats before without disqualification, and one worker later qualified to work at a nuclear plant. Regardless, the remaining evidence is sufficient for a reasonable jury to find Heaton's ultimate layoff was motivated, at least in part, by the fact Heaton had filed the discrimination claim, and Weitz's otherwise legitimate reasons for the layoff were merely pretextual.

The district court properly denied Weitz's Rule 50 motion, particularly in light of the fact Rule 50 motions should only be granted when "there is a *complete absence of probative facts* to support the verdict," see Wilson, 382 F.3d at 769-70 (8th Cir. 2004) (citation omitted) (emphasis added), and when the "record contains *no proof beyond speculation* to support the verdict." Id. at 770 (citation omitted) (emphasis added). Because we must give "great deference to the jury's verdict," id. at 769 (citation omitted), the district court's denial of Weitz's motion for judgment as a matter of law is affirmed.

B.    Punitive Damages

Weitz next contends the district court erred in submitting punitive damages to the jury and in denying Weitz's Rule 50 motion on punitive damages. A plaintiff is entitled to punitive damages in a retaliation case only if the employer retaliated with

malice or with reckless indifference to federally protected rights.  See Christensen v. Titan Distribution, Inc., 481 F.3d 1085, 1096 (8th Cir. 2007).  "Malice or reckless indifference exhibited by employees working in a managerial capacity can be imputed to the employer if they were acting in the scope of their employment."  Dominic v. DeVilbiss Air Power Co., 493 F.3d 968, 976 (8th Cir. 2007) (citation and internal quotation marks omitted).  "An employer cannot be vicariously liable . . . for discriminatory employment decisions of managerial agents where those decisions are contrary to the employer's *good-faith efforts* to comply with Title VII."  Id. (citation and internal quotation marks omitted) (emphasis added).

Weitz argues it made a good faith effort to respond to the discrimination against Heaton.  Weitz notes it responded quickly to Heaton's original complaint against Huber, forcing Huber to take early retirement.  Indeed, Weitz initially responded appropriately to Heaton's complaint as to Huber's improper remarks.[2]  Even though Weitz initially responded appropriately to Heaton's complaint, its agents thereafter did not react appropriately.  Novy and Henecke, both members of the management team, directly retaliated against Heaton, with Henecke calling Heaton a "spic," and Novy attempting to fire Heaton for the Henecke "spic" confrontation, and then requiring Heaton to apologize to Henecke.  Novy was plainly acting within the scope of his employment when he acted to terminate Heaton.

It is insufficient for the employer simply to know it is discriminating against an employee.  See Chalfant v. Titan Distribution, Inc., 475 F.3d 982, 991 (8th Cir. 2007).

---

[2]Heaton specifically asked DeVries not to tell Novy about the complaint, because Heaton believed Novy might retaliate against him based on Novy's friendship with Huber.  Despite Heaton's request, DeVries immediately assigned Novy to investigate Heaton's complaint.  Although this may not rise to the level of malice, a reasonable jury could believe DeVries (the responsible Weitz agent) acted with *reckless disregard* toward the likelihood of retaliation.  We need not rely on this inference, however, given the other facts supporting punitive damages outlined in this section.

The employer must also know it may be violating federal law. See id. Evidence supports Novy knew he was violating federal law when he eventually terminated Heaton. When Novy first attempted to fire Heaton, with Heaton's final paychecks already prepared, Novy immediately rescinded the termination when Heaton asked if the firing were related to Heaton's discrimination complaint against Huber. Novy had worked on Weitz human resource issues for twenty years, was assigned to investigate both of Heaton's discrimination complaints, and was therefore inferentially familiar with federal discrimination laws.

A reasonable jury also could find DeVries's actions undercut Weitz's defense that Novy's actions contravened Weitz's good-faith efforts. DeVries's actions are plainly imputed to Weitz, and DeVries was familiar with federal law. DeVries was Weitz's personnel benefits manager, having attended training on state and federal anti-discrimination laws, and was listed by Weitz as the contact person for making discrimination complaints.

A reasonable jury could find Weitz's response to Novy's actions failed to demonstrate a good-faith effort to comply with Title VII. When Heaton contacted DeVries the second time, he described the actions Novy had taken, and Heaton specifically stated he felt he was being retaliated against by Novy because Heaton had made the initial discrimination complaint against Huber. DeVries assigned Novy to investigate this second complaint, a complaint against Novy himself. DeVries's personal investigation was cursory. DeVries initially accepted the explanation Heaton had been offered work three or four times, but Heaton had declined the work. When Heaton denied this, DeVries investigated further and was told Kula, a superintendent, had offered Heaton the purported work at the Cargill project. Heaton again denied this, and specifically informed DeVries, "Henecke is the project manager for Cargill, and Matt Kula is the superintendent. Matt [Kula] has told [another employee] many times that Brian Henecke would not let me work at Cargill." DeVries did not investigate this claim. Although Heaton had only been offered the multiple-level

demotion to journeyman, DeVries did not look into this fact further because, "In [her] opinion, it was work, so [she] didn't get into what kind of work it was." This opinion ignored the evidence that (1) other superintendents at Weitz continued to work by doing busywork or by being doubled-up with another superintendent and doing labor instead of supervision; (2) if a superintendent is laid off at Weitz, the employee would normally come back to work after the layoff as a superintendent; and (3) the journeyman position provided little job security, because journeymen are the first to be terminated.[3]

Although this presents a close question, there is not a complete absence of probative facts to support the verdict. See Wilson, 382 F.3d at 769-70 (8th Cir. 2004). Viewing the evidence in the light most favorable to Heaton, a reasonable jury could find DeVries placed a biased or perceived partial person (Novy) in charge of the investigations, and the investigations were cursory and indifferent, failing to demonstrate a good-faith effort to comply with Title VII. See MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 931 (8th Cir. 2004) (ruling there was no good faith effort to comply with Title VII when the employer conducted only minimal investigations, issued no reprimand to the offender, and failed to communicate the results of the investigation to the plaintiff); and Ogden v. Wax Works, 214 F.3d 999, 1010 (8th Cir. 2000) (concluding there was no good faith effort when the employer conducted a "cursory investigation" focused more on the plaintiff's performance than

---

[3]In Dominic, we emphasized the company "launched *thorough investigations* in response to Dominic's complaints about sexual harassment, retaliation, and accounting irregularity." Dominic, 494 F.3d at 976 (emphasis added). The company also "consulted with counsel about the sufficiency and efficacy of their investigations." Id. "[T]he company minimized communication between [the alleged offender] and Dominic . . . granted Dominic's request to report to a human resources manager in a separate subsidiary, and offered him several accommodations." Id. Finally, the company required the alleged offender "to participate in a supervisory training session and to organize sexual harassment training for all salaried employees." Id.

the offender's behavior). Given the great deference owed to jury determinations, the district court did not err in denying Weitz's Rule 50 motion on punitive damages.[4]

### C. Emotional Distress

Weitz next claims the district court erred by denying Weitz's motion for judgment as a matter of law on the issue of emotional distress. In support of its argument, Weitz cites Forshee v. Waterloo Industries, Inc., 178 F.3d 527, 531 (8th Cir. 1999). In Forshee, this court reiterated the requirement that, to support a claim for emotional distress, the claim "must be supported by competent evidence of 'genuine injury.'" Id. (citation omitted). Although Forshee cried about the job loss immediately after her termination, there was no other evidence of additional emotional distress. Id. There was no physical injury and no testimony about additional outward manifestation of emotional distress, and Forshee was not treated for psychological or emotional injury. Id.

Heaton's case is readily distinguishable from Forshee. Heaton's case is more analogous to our precedent affirming a jury award under similar circumstances. See Christensen, 481 F.3d at 1096-97. In Christensen, we recognized an emotional distress claim "must be supported by competent evidence of genuine injury." Id. at 1097. We explained "[a] plaintiff's own testimony can be sufficient for a finding of emotional distress, and medical evidence is not necessary." Id. (citation omitted). We

---

[4]Weitz's argument it acted on the permissible basis of scarce employment availability is also unavailing. After the offer for Heaton to work as a journeyman, management level positions opened up, and Heaton was not offered those positions. Weitz essentially asks us to re-weigh the evidence after a jury has already done so. We decline Weitz's request. See, e.g., Kim v. Nast Finch Co., 123 F.3d 1046, 1066 (8th Cir. 1997) (rejecting the argument "at most, there was only circumstantial evidence of discrimination consisting of inconsistent explanations for the allocation of scarce employment opportunity," because "[t]here was also evidence [the business] systematically retaliated against [the plaintiff] for filing an employment discrimination charge . . . ." (internal quotation marks omitted)).

-12-

noted a plaintiff "must offer specific facts as to the nature of his claimed emotional distress and the causal connection to the employer's alleged violations." Id. (alteration and citation omitted). We then affirmed the jury's emotional damages award based on the plaintiff's and his spouse's testimony (1) the plaintiff "experienced significant stress after not being hired"; (2) "he was distraught and withdrawn"; (3) he was upset at not being the breadwinner; (4) "he cried and felt stress during [the ensuing] ten month job search"; and (5) he was still distressed after finding new work because it was not as fulfilling as his previous employment. Id. Heaton presented similar evidence, testifying that following his termination, Heaton felt "inadequate" and had no sense of identity, and Heaton described how his reputation among his peers was damaged. Heaton went to a psychologist and a family counselor for help, and he began taking antidepressant medication, which he was still taking at the time of trial. The medication had negative side effects, including sweating, nausea and insomnia. Given the guidance of Christensen, the district court did not err in denying Weitz's motion for judgment as a matter of law on the issue of emotional damages.

### D.     Attorney Fees

Weitz contends the district court abused its discretion in failing to reduce adequately Heaton's award of attorney fees because Heaton abandoned three of his five original claims at the summary judgment stage of the case. The district court considered this fact, and reduced the award by 10%.

The district court relied on Hensley v. Eckerhart, 461 U.S. 424, 434-35 (1983), and determined, first, whether Heaton failed to prevail "on claims that were unrelated to the claims on which he succeeded." The district court reasonably concluded the three failed claims (state and federal discrimination claims, and a blacklisting claim) all "arose out of the [same general] facts." Namely, a supervisor made racially derogatory comments to Heaton, Heaton reported the incident, Heaton was forced to choose between a demotion or a layoff, and Heaton was not called back to work at a

-13-

later time.  The district court properly recognized "Heaton's attorneys 'devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim by claim basis[,]'" and "the evidence and work on the various claims was intertwined and necessary to all of the claims[.]"  (quoting <u>Hensley</u>, 461 U.S. at 435).

Weitz also argues Heaton's blacklisting claim is entirely unrelated to the retaliation claim, because "Heaton's retaliation claims are based on his layoff and Weitz's failure to offer him a [later] position[,]" yet "[Heaton's] blacklisting claims are based on Iowa Code § 730.2, which prohibits companies from blacklisting any discharged employee . . . ."  Blacklisting can be a form of retaliation, and Heaton's claim of blacklisting is still based upon the theory Heaton was denied re-employment because of his discrimination complaint.

The district court analyzed Heaton's overall level of success.  The district court properly noted Heaton won an award of $137,070.44 in compensatory damages, and $25,000.00 in punitive damages, finding this was "a substantial judgment against Weitz" (citing <u>Wal-Mart Stores, Inc. v. Barton</u>, 223 F.3d 770, 772-73 (8th Cir. 2000) for the proposition "finding $25,000.00 judgment in a Title VII sexual harassment case on one of the plaintiff's six original claims to be a 'substantial judgment' and a 'significant' success.").  "If the plaintiff has won excellent results, he or she is entitled to a fully compensatory fee award, which will normally include time spent on related matters on which he or she did not win."  <u>Id.</u> at 773 (citation and internal alterations omitted).  Heaton's victory was, by any reasonable standard, significant, particularly in light of the principle that "because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases . . . to depend on obtaining substantial monetary relief."  <u>Id.</u> (quoting <u>City of Riverside v. Rivera</u>, 477 U.S. 561, 575 (1986)).  The district court did not abuse its discretion in lowering the attorney fees by 10%, and declining to lower them further.

## III. CONCLUSION

The judgments of the district court are affirmed.

_____